UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FIREBIRDS INTERNATIONAL, LLC, §
§
   Plaintiff, §
§
v. §    CIVIL ACTION NO. 3:17-CV-2719-B
§
FIREBIRD RESTAURANT GROUP, §
LLC, MICHAEL D. KARNS, and §
FIREBIRD IP, LLC, §
§
§
   Defendants. §

## MEMORANDUM OPINION AND ORDER

     This is a trademark infringement dispute. Plaintiff Firebirds International LLC owns and

operates restaurants under the mark "Firebirds." Defendant Firebird Restaurant Group operates a

restaurant-management company, Firebird Restaurant Group. Plaintiff sued Defendants under

various trademark-infringement-related laws. Before the Court are the parties' crossmotions for

summary judgment. Plaintiff seeks partial summary judgment on the issue of Defendants' liability for

trademark infringement and the related claims. Doc. 71, Pl.'s Mot. Defendants seek partial summary

judgment on Plaintiff's claim for damages and unjust enrichment. Doc. 72, Defs.' Mot. Because fact

issues preclude both requests, the Court **DENIES** these motions (Docs. 71 & 72).

## I.

## BACKGROUND

     Plaintiff Firebirds International LLC owns and operates a chain of nearly fifty restaurants in

nineteen states across the country. Doc. 77, Pl.'s Br., 3; Doc. 78, Pl.'s App., 31–32 (chart listing

restaurants). The restaurants are steakhouses that offer "an upscale dining experience at a casual, or affordable, price point." Doc. 78, Pl.'s App., 2 ¶ 6 (Decl. Eason). All of Plaintiff's restaurants operate under the "Firebirds" mark. *Id.* at 2 ¶ 5. Some restaurants display only "Firebirds":



While some restaurants display a sign that says "Firebirds Wood Fired Grill":



*Id.* at 41, 45. The mark puts emphasis on both the "F" and the "S" in the word "Firebirds." There are currently no Firebirds restaurants in Texas, but Plaintiff plans to expand into this market by 2020. *Id.* at 2 ¶ 4. And Plaintiff recently opened its first restaurant in Oklahoma. *Id.*

In 2001, the United States Patent and Trademark Office ("USPTO") issued Plaintiff a registration for the "Firebirds" mark to be used for restaurant services. Doc. 77, Pl.'s Br., 4 (citing Doc. 78, Pl.'s App., 46–49). Additionally, Plaintiff owns four related registrations: (1) "Firebirds Wood Fired Grill" for restaurant services; (2) "Firebirds Firebar" for restaurant and bar services; (3) "Firebirds" for wine; and (4) "Firebirds" + design for restaurant and bar services, as well as wine. *Id.* at 5 (citing Doc. 78, Pl.'s App., 59–66). Plaintiff also has a pending application for the mark "Firebirds Inner Circle" used for a consumer-loyalty program. *Id.* (citing Doc. 78, Pl.'s App., 67–73). Plaintiff uses these marks for commercial, promotional, and advertising purposes. Doc. 96-1, Pl.'s Resp., 5–6. For example, they're used on menus, flyers, print advertisements, and in television and radio advertisements, internet promotions, social media, and event sponsorships. *Id.* at 6.

Defendant Firebird Restaurant Group ("FRG") is a restaurant-management company that owns various restaurants in north Texas. Doc. 73, Defs.' Br., 5–6. FRG owns and operates restaurants doing business under six brands: El Fenix Mexican Restaurant, Snuffer's Restaurant & Bar, Village Burger Bar, Meso Maya, Taqueria La Ventana, Tortaco, and Sunrise Mexican Foods. Doc. 98, Defs.' Resp., 8. These brand restaurants, in turn, own around fifty restaurant locations. *Id.*[1]

---

[1] Additionally, Defendant Karns directly owns El Fenix Oklahoma. Doc. 98, Defs.' Resp., 8. The Court notes that Plaintiff characterizes the ownership differently—it argues that FRG alone owns and operates the approximately fifty restaurants as a single economic entity. Doc. 77, Pl.'s Br., 7–8.

Defendant Michael Karns started FRG in 2008 as a holding company for the El Fenix restaurants, the first of the brand restaurants he purchased. Doc. 77, Pl.'s Br., 6. Karns continued to use the El Fenix mark for marketing and business purposes; FRG was merely used as a shell company to acquire El Fenix. *Id.* It was not until 2012 that Karns decided to "rebrand"[2] and start using the "Firebrand Restaurant Group" mark as a logo. *Id.* Defendants commissioned someone to create a logo for their FRG mark. Plaintiff contends that Karns "rebranded" FRG for several reasons. First, FRG started adding new restaurant brands to the company. *Id.* Second, Plaintiff argues that "Karns felt that he was having trouble looking cool as a restaurant group with El Fenix as the mother brand." *Id.* (internal quotations omitted). Then, in 2013, Plaintiff claims that Defendants started to use their mark as a "motherbrand" to advertise and market the brand restaurants. *Id.* The mark can be seen in the upper right-hand corner of this photo:

---

[2] Defendants dispute that this change in usage was a "rebranding." Doc. 98, Defs.' Resp., 9.



*Id.* at 7 (citing Doc. 78, Pl.'s App., 182). The type-written portion of the mark displays the word "Firebird" in large print and "restaurant group" in smaller print. The mark is also typically featured with the large flame, as displayed above. Plaintiff argues that, since 2012 or 2013, Defendants Karns and FRG "advertise and promote the restaurants that they own and operate under the infringing 'Firebird' mark both locally and nationally within the restaurant industry." *Id.* Plaintiff produces evidence that shows that Defendants have used the FRG mark on, among other things, restaurant menus, flyers, business cards, print advertisements, websites, promotional information, press releases, social media, and in event and charity sponsorships. *Id.* at 6. Defendants dispute that they use the FRG mark as a trademark or anything other than a "business name." Doc. 98, Defs.' Resp., 9. They

also push back on Plaintiff's characterization of their use of the FRG logo as a "motherbrand." *Id.* at 6. On the other hand, Karns has expressed that he wanted to use the newly designed logo to "add other restaurants underneath it." Doc. 73, Defs.' Br., 3.

In 2013, Defendant Firebird IP, LLC filed a trademark registration with the USPTO for the FRG mark to be used for "[r]estaurant management for others." Doc. 78, Pl.'s App., 249. Plaintiff contends that at some point before or during this process Defendants became aware of the "Firebirds" marks through a clearance search conducted by their attorneys. Doc. 77, Pl.'s Br., 7. Despite this, Defendants proceeded with their trademark application. *Id.* The USPTO attorney assigned to the application issued an initial refusal based on likelihood of confusion with the Firebirds mark. *Id.* at 8 (citing Doc. 78, Pl.'s App., 274–310). Ultimately, the examining attorney issued a Final Office Action that maintained the initial refusal decision. *Id.* at 9. The examining attorney found that the marks were very similar and that the parties' services were closely related. Doc. 78, Pl.'s App., 316. Then, Defendants filed a request for reconsideration in response to the Final Office Action, renewing arguments and evidence they previously submitted and submitting additional evidence. Doc. 99-10, Defs.' App., 583–86. In a turn of events, the USPTO allowed Defendants' application and published the FRG mark in the Trademark Official Gazette. Doc. 99-11, Defs.' App., 587. Plaintiff proceeded to oppose Firebird IP's application in the Trademark Trial and Appeal Board ("TTAB"). Doc. 77, Pl.'s Br., 9. That proceeding was stayed pending the outcome of this litigation. *Id.* at 10.

On October 4, 2017, Plaintiff filed its original complaint in this case. Doc. 1, Orig. Compl. The complaint brought claims for federal and common law trademark infringement and unfair competition. *Id.* ¶¶ 47–66. It also brought a claim for unjust enrichment. *Id.* ¶¶ 67–71. As relief,

Plaintiff sought: (1) a permanent injunction preventing Defendants from, inter alia, continuing to use its allegedly infringing mark; (2) damages based on illicit profit, reasonable royalties, corrective advertising, and other harm suffered as a result of the complained activity; and (3) attorneys' fees and costs under 15 U.S.C. § 1117. *Id.* ¶¶ A–J. Plaintiff demanded a jury trial on all issues of triable fact. *Id.* at 15. Plaintiff filed an amended complaint on June 22, 2018, which made essentially the same allegations and claims as the original, but included Michael Karns as a defendant and added allegations specific to him. Doc. 38, First Am. Compl. The first amended complaint is currently the operative complaint in this case.

Now, before the Court are the parties' motions for summary judgment. Plaintiff seeks partial summary judgment against Defendants on their liability for the trademark and unfair competition claims. Doc. 71, Pl.'s Mot. Defendants seek partial summary judgment on Plaintiff's claim for damages and unjust enrichment. Doc. 72, Defs.' Mot. Both motions have been fully briefed, so the Court addresses them now.

## II.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party." *Burrell v. Dr. Pepper/Seven Up Bottling Grp.*, 482 F.3d 408, 411 (5th Cir. 2007). And a fact "is 'material' if its resolution could affect the outcome of the action." *Id.*

In reviewing crossmotions for summary judgment, courts examine "each party's motion

independently" and view "the evidence and inferences in the light most favorable to the nonmoving party." *JP Morgan Chase Bank, N.A. v. Data Treasury Corp.*, 823 F.3d 1006, 1011 (5th Cir. 2016) (quoting *Morgan v. Plano Indep. Sch. Dist.*, 589 F.3d 740, 745 (5th Cir. 2009)). "A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party." *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 896 (5th Cir. 2013) (per curiam).

## III.

## ANALYSIS

A.    *Plaintiff's Motion for Partial Summary Judgment on Liability*

In its motion for partial summary judgment, Plaintiff asks the Court to find that there is no genuine dispute that Defendants are liable for trademark infringement, false designation of origin, and unfair competition. Doc. 77, Pl.'s Br., 1. The dispositive inquiry for these claims is whether there is a likelihood of confusion between the parties' marks.[3] Thus, the Court's likelihood of confusion analysis below for Plaintiff's federal trademark infringement claim applies also to Plaintiff's federal claims for unfair competition and false designation of origin and common law claims for trademark infringement and unfair competition. And because a reasonable jury could find no likelihood of confusion between the parties' marks, the Court denies Plaintiff's request for summary judgment as to liability on each of these claims.

To establish trademark infringement, a plaintiff must demonstrate ownership of a legally

---

[3] "Plaintiff's claims of false designation of origin, federal and common law unfair competition, and common law trademark infringement are all governed by the same likelihood of confusion inquiry used to determine whether [federal] trademark infringement has occurred." *See U.S. Risk Ins. Grp., Inc. v. Risk Mgmt., LLC*, 2013 WL 4504754, at *19 (N.D. Tex. Aug. 20, 2013) (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 483–84 (5th Cir. 2004) and *Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 667, 674 (W.D. Tex. 2008)).

protectable mark and a likelihood of confusion between the marks. *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235–36 (5th Cir. 2010). First, the Court considers whether Plaintiff has a legally protectable interest in the Firebirds mark. Proof of registration with the United States Patent and Trade Office is "prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services." *Id.* at 237. Plaintiff owns five related and valid United States trademark registrations for the Firebirds mark. Doc. 77, Pl.'s Br., 4–5. The first registration was issued on December 18, 2001. *Id.* at 4. Defendants do not challenge the registrations, the ownership, or the incontestible status of the Firebirds marks. Doc. 98, Defs.' Resp., 20. Plaintiff has also used the mark in commerce since around the time it was first registered.[4] From this, the Court can conclude that Plaintiff has established that it owns a legally protectable mark.

Next, to show a "likelihood of confusion," Plaintiff must show that Defendants' use of their mark "create[d] a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship" of Defendants' products or services. *Springboards to Educ., Inc. v. Hou. Indep. Sch. Dist.*, 912 F.3d 805, 811–12 (5th Cir. 2019) (quoting *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters.*, 141 F.3d at 193. Courts consider a non-exhaustive list of eight factors to determine whether a party has established likelihood of confusion. The factors include: "(1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products [or services]; (4) identity of retail outlets and

---

[4] Defendants dispute whether Plaintiff started using the mark in commerce in 2001 or 2002. Doc. 98, Defs.' Resp., 20. This discrepancy does not affect the analysis here.

purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008). "The absence or presence of any one factor ordinarily is not dispositive; indeed, a finding of likelihood of confusion need not be supported even by a majority of the . . . factors." *Id.* (quoting *Conan Props., Inc., v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)). Word association between the marks is, in itself, insufficient to establish a probable likelihood of confusion. *Viacom Int'l v. IJR Capital Inv., L.L.C.*, 891 F.3d 178, 192 (5th Cir. 2018). And "the court must consider the marks in the context that a customer perceives them in the marketplace." *Id.* (internal quotations omitted) (quoting *Scott Fetzer*, 381 F.3d at 485).

Plaintiff asserts that each of the eight digits weighs in favor of finding a likelihood of confusion and, thus, that the Court should rule for it as a matter of law. "Likelihood of confusion is a question of fact." *Id.* "However, summary judgment is proper if the record compels the conclusion that the movant is entitled to judgment as a matter of law." *Id.* (internal quotations omitted) (quoting *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009)). The Court analyzes each factor in turn.

*(1) Strength of Plaintiff's Mark*—The focus here is on Plaintiff's "Firebirds" mark because Plaintiff is the senior user. *See Elvis Presley Enters.*, 141 F.3d at 201. The stronger Plaintiff's mark, the greater the protection it receives "because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user." *Id.* Two separate considerations are relevant—the conceptual strength and the commercial strength of the mark. Conceptual strength "considers where the mark falls on a spectrum: 'Marks may be classified as generic, descriptive, suggestive, or arbitrary

and fanciful. . . . Within this spectrum the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *Am. Rice*, 518 F.3d at 330 (alterations incorporated) (quoting *Falcon Rice Mill, Inc. v. Cmty. Rice Mill, Inc.*, 725 F.2d 336, 346 (5th Cir. 1984)). Commercial strength is the standing of the mark in the marketplace. *Id.* Plaintiff argues there is no fact issue that its mark is strong based on both of these considerations.

Starting with the conceptual strength, Plaintiff argues its mark is arbitrary and thus inherently distinctive. Doc. 77, Pl.'s Br., 18. Marks that are suggestive, arbitrary, or fanciful are deemed "inherently distinctive and are entitled to protection." *Xtreme Lashes*, 576 F.3d at 227 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). Arbitrary marks have no relation to the product or service with which they are used. *Springboards*, 912 F.3d at 814. For example, the mark "APPLE" is arbitrary when used for computers because it neither describes nor suggests anything about the nature of the computers. J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 11:11 (5th ed. 2019) (hereinafter "*McCarthy on Trademarks*"). Defendants dispute that the Firebirds mark is arbitrary. Doc. 98, Defs.' Resp., 21.[5] Defendants argue that the mark should not be afforded the same degree of protection as "coined and fanciful terms such as Kodak or Xerox." *Id.* (quoting *Amstar Corp v. Domino's Pizza Inc.*, 615 F.2d 252, 260 (5th Cir. 1980) (holding that the mark "Domino," while it may be arbitrary, was not coined or fanciful and thus was entitled to less protection)). Rather, the name "Firebirds," Defendants argue, comes from the method of cooking

---

[5] Plaintiff asserts that Defendants conceded the Firebirds mark is arbitrary. Doc. 114, Pl.'s Reply, 12. The Court agrees that Defendants have not formulated a serious response to rebut the argument that the mark is arbitrary. *See* Doc. 98, Defs.' Resp., 21. But the Court is unwilling to go so far as to find that Defendants conceded the point. They merely argued that "its application to restaurant services *may* be arbitrary . . . ." *Id.*

in wood-fired grills, which is done in all of Plaintiff's restaurants, and is thus descriptive. *Id.*

The Court can rule out a finding that the mark is generic or descriptive. Generic marks refer to the class of which a good is a member. *Xtreme Lashes*, 576 F.3d at 227. Firebirds is clearly not generic when used as a mark for a restaurant (e.g., "Steakhouse"). Nor is it descriptive. A descriptive term provides an attribute or quality of a good. *Id.* While "Fire" taken alone may be descriptive of the restaurant's grill, the term "Firebirds" is not obviously descriptive of Plaintiff's services. Thus, the mark is at the very least suggestive. A suggestive mark "suggests, but does not describe, an attribute of the good; it requires the consumer to exercise his imagination to apply the trademark to the good." *Xtreme Lashes*, 576 F.3d at 227; *see also Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 452 (5th Cir. 2017) ("Examples of suggestive terms include 'Penguin' for a refrigerator brand, and 'Coppertone' for sun tanning products.") (internal citations omitted). As Plaintiff points out, "Firebirds" is a common linguistic term used in various cultural and commercial categories, such as mythology, film, print, and sports. Doc. 77, Pl.'s Br., 18 (citing 78-1, Pl.'s App., 619–22). There is no evidence before the Court that suggests the term is commonly used in connection with restaurant services. Thus, any association between the mark and the service is not "intrinsic," but requires some imagination on the part of the customer. *See, e.g., All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 509 (5th Cir. 2018) (finding that the image of a bird was not "intrinsic" to the services of a good-government organization as a generic or descriptive mark would be); *Am. Rice*, 518 F.3d at 330 (finding that "image of a girl icon being used to sell rice is not intrinsic to rice as a product"). The Court thus finds that the mark is, at least, suggestive and deserving of the inherently distinctive status. The mark may even be arbitrary because it is unclear if an ordinary customer could even

imagine what type of services Plaintiff provides from the word "Firebirds," *see Brown v. Bridges*, 2016 WL 3660666, at \*8 (N.D. Tex. Jan. 26, 2016), but that is an issue better left to the jury.

The Court also recognizes that the strength of the Firebirds mark is enhanced because of its PTO registration. A mark that is "incontestable" is afforded more weight under this digit. *See Am. Rice*, 518 F.3d at 330. As the Court discussed above and as Defendants do not dispute, the Firebirds mark is incontestable and thus "protected from challenge by a presumption of validity." *Id.* This evidence can be considered when determining strength. *Id.*; *US Risk Ins. Grp.*, 2013 WL 4504754, at \*8 (N.D. Tex. Aug. 20, 2013). The conceptual strength of the mark tilts the scale in Plaintiff's favor.

Next is the commercial strength of the mark. This is based on the mark's standing in the marketplace. *Am. Rice*, 518 F.3d at 330 (citing *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 315 (5th Cir. 1981)). Duration of use and advertising are considered in assessing the commercial strength. *All. for Good Gov't*, 901 F.3d at 510 (citing *Sun-Fun Prods.*, 656 F.2d at 190–91). Some courts in this circuit also consider public recognition and uniqueness. *See RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 698–98 (S.D. Tex. 2009) (citing *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1179 (9th Cir. 1988)). Further, "[e]xtensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user." *Springboards*, 912 F.3d at 815 (citing *Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 170 (5th Cir. 1986)).

Plaintiff argues that the Firebirds mark is commercially strong for a few reasons. First, it notes that the mark has been in use for eighteen years and used at almost fifty restaurant locations across

nineteen states. Doc. 77, Pl.'s Br., 19. Second, Plaintiff argues that its brand has national reach, citing to news articles and restaurant rankings from national restaurant-industry publications that recognize Firebirds as a top emerging restaurant and brand. *Id.* (citing Doc. 78-1, Pl.'s App., 114–41). Third, Plaintiff provides evidence from customers that indicates that the Firebirds' brand has an extended geographic reach. *Id.* Fourth, Plaintiff shows that it has spent over $12.5 million in advertising its restaurants in various media sources. *Id.* at 19–20 (citing Doc. 78-1, Pl.'s App., 5, 74–113, 628–29). And finally, Plaintiff argues its mark is commercially strong because it owns an entire family of Firebirds marks, such as "Firebirds Firebar" and "Firebirds: Firebirds Wood Fired Grill," which are also incontestable (or, in the case of one mark, pending registration). *Id.* at 20.

Defendants attempt to undercut this evidence by focusing on two points. First, they respond that the Firebirds mark is unknown in Texas and Oklahoma, which, they stress, are the only relevant marketplaces for this case. Doc. 98, Defs.' Resp., 22. Second, Defendants assert that the Firebirds mark is commercially weak because the term "Firebird" is used extensively in other trademarks. *Id.* at 22–23 (for example, the Pontiac Firebird and Firebird Food Store).

Starting with Defendants' geographic argument, the Court finds that Defendants stretch the law too far in arguing that the only relevant marketplaces are Texas and Oklahoma. Admittedly, "[c]ontext is critical to a likelihood-of-confusion analysis." *Viacom Int'l*, 891 F.3d at 192. But when determining the commercial strength of a mark, the law does not strictly limit consideration to the geographic operating area of the junior user, as Defendants argue. Indeed, the cases Defendants cite do not impose any such limit. For example, in a trademark dispute between the University of Houston and the Houston College of Law, a district court found that the University of Houston's

trademarks were "somewhat strong—particularly in the markets relevant to this litigation." *Bd. of Regents of the Univ. of Hous. Sys. v. Hous. College of Law, Inc.*, 214 F. Supp. 3d 573, 587 (S.D. Tex. 2016). The court defined the relevant markets as the legal industry, and Texas and Florida, from where the two law schools "overwhelmingly" targeted prospective students. *Id.* at 586. But the court also relied on evidence of the university's national reputation, such as the U.S. News and World Report ranking of the law school and the football team's national acclaim. *Id.* Thus, while the similarity of the geographic areas the schools operated in was a factor that bolstered the University of Houston's commercial strength, nowhere did the district court hold that this consideration is dispositive or required. *Id.* Further, the court relied on another case from the Southern District of Texas (the second case cited by Defendants) for the proposition that courts look to the strength of the senior user's mark in the relevant market. *Id.* at 586 n.45 (citing *Quantum Fitness Corp. v. Quantum LifeStyle Ctrs., L.L.C.*, 83 F. Supp. 2d 810, 819, 830 (S.D. Tex. 1999)). But the *Quantum* court focused on the relevant industry involved—the fitness industry. The court noted that "while weak in the overall market for goods and services, [the mark] is sufficiently strong in the fitness industry to create a likelihood of confusion." *Quantum*, 83 F. Supp. 2d at 822. Thus, in determining commercial strength, that court focused on the relevant industry involved as opposed to the geographic proximity of the senior and junior users.[6]

From this, the Court finds that the relevant marketplaces here are both the restaurant industry and Texas/Oklahoma. But, evidence of national reputation may be probative of commercial strength in these specific marketplaces. As discussed above, Plaintiff provides a significant amount

---

[6] The *Quantum* court did discuss the geographic location of third-party businesses with *Quantum* in the name. 83 F. Supp. 2d at 821. But that is not at issue here.

of evidence related to its commercial strength. But this evidence is almost exclusively limited to the recognition of the Firebirds mark on a national scale or in the restaurant industry generally. Notably lacking from Plaintiff's evidence is any indication of commercial recognition in Texas or Oklahoma. *See* Doc. 77, Pl.'s Br., 19–20. It then makes sense why Defendants focus their response on this gap in Plaintiff's case, and the Court finds this point well-taken. Additionally, the Court finds merit in Defendants' argument that extensive third-party usage of the term "Firebird" in related and unrelated industries militates against finding Plaintiff's mark commercially strong. *See* Doc. 98, Defs.' Resp., 22–23; *see also Springboards*, 912 F.3d at 815 ("Extensive third-party use of a term throughout the market suggests that consumers will not associate the junior mark's use with the senior mark user."). Plaintiff's argument that this evidence is insufficient because Defendants have not cited third-party federal trademark registrations is unavailing; other courts have accepted evidence similar to what Defendants have shown here. *See Quantum Fitness*, 83 F. Supp. 2d at 821–22 (accepting evidence of phonebook and internet searches showing third-party usage of the word "quantum"). Other USPTO applications or registrations containing the word "Firebirds" may be relevant to this inquiry, but the Court is not convinced that they are necessary to survive summary judgment.

Thus, in determining the strength of the Firebirds mark, the Court finds that while Plaintiff has presented substantial evidence that its mark is conceptually strong, Plaintiff's evidence of commercial strength is more uncertain. A reasonable factfinder could then find that this factor, on the whole, does not weigh in Plaintiff's favor.

*(2) Similarity of the Marks*—When considering the similarity of the parties' marks, courts look at "the mark's appearance, sound, and meaning." *Bd. of Supervisors for La. State Univ. Agric. &*

*Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 479 (5th Cir. 2008). "The more similar the marks, the greater likelihood of confusion." *Streamline Prod.*, 851 F.3d at 454. "Even if two marks are distinguishable, we ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Id.* (quoting *Xtreme Lashes*, 576 F.3d at 228). "In assessing mark similarity, we 'give more attention to the dominant features of a mark.'" *Id.* Courts also consider the context in which the marks appear, as well as the color schemes and design elements of the marks. *Id.* (citing *Smack Apparel*, 550 F.3d at 480).

Here, the Court agrees with Plaintiff that the "dominant feature" of the marks is the word "Firebird(s)." *See* Doc. 77, Pl.'s Br., 22. This requires the Court to focus on the use of the word "Firebird(s)" in the parties' marks, as the other words used in the marks are generic. *See Streamline*, 851 F.3d at 454 (focusing on the word "Streamline" in both marks). The words are essentially identical—"Firebirds" versus "Firebird"—and are used in the same context (*i.e.* the parties' logos). On the other hand, as Defendants note, Plaintiff's mark places emphasis on the "F" and "S" in "Firebirds," and sometimes appears alongside different words (*e.g.* Wood Fired Grill versus Restaurant Group). Doc. 98, Defs.' Resp., 23. Additionally, Defendants' mark includes a "prominent flame," while Plaintiff's does not. *Id.* Giving more attention to the dominant features of these marks, the Court finds that the marks are similar and that this factor weighs in favor of finding a likelihood of confusion. The emphasis and prominence of the word "Firebird" and the circumstances of use convince the Court that a reasonable person could believe the two services have a common origin

or association. This factor weighs in favor of granting summary judgment for Plaintiff.[7]

(3) *Similarity of the Products or Services*—"The greater the similarity between the products and services, the greater the likelihood of confusion." *Streamline*, 851 F.3d at 454 (quoting *Xtreme Lashes*, 576 F.3d at 229). Plaintiff provides restaurant services at around fifty restaurant locations, which display the signs "Firebirds" or "Firebirds Wood Fired Grill." Doc. 77, Pl.'s Br., 23. Defendants operate a restaurant group that owns six brand restaurants at forty-eight locations. Doc. 98, Defs.' Resp., 28. But each of these restaurants has its own logo and trademark different from the FRG mark (*e.g.*, El Fenix, Snuffer's, Meso Maya). *Id.* Defendants argue that they provide "restaurant management services" and not "restaurant services," like Plaintiff provides. Therefore, they argue, the parties' services do not share similar consumers and thus there is no risk of confusion between the two marks. *Id.* 28–30. Plaintiff argues that, even if it is assumed the services differ, the distinction is immaterial. Doc. 77, Pl.'s Br., 23. It cites to case law that holds "[d]irect competition between the parties' services or products is not required in order to find a likelihood of confusion. . . . When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection." *Elvis Presley Enters.*, 141 F.3d at 202. In other words, Plaintiff argues that consumers of Firebird Restaurant Group are likely to assume that Firebirds is the source of those services, and vice versa. Plaintiff also attempts to minimize this distinction by arguing that the services are

---

[7] Defendants complain also that Plaintiff's mark is not similar to their mark because Plaintiff has not clearly identified its mark or its family of marks. Doc. 98, Defs.' Resp., 23–25. The Court finds no merit in this argument. Plaintiff has plainly identified its mark in numerous places. *See, e.g.*, Doc. 38, Am. Compl., ¶¶ 14–21; Doc. 77, Pl.'s Br., 7, 12–14, 16–19, 26–32; Doc. 78, Pl.'s App., 41, 43, 45. Plaintiff has also provided the USPTO trademark applications and registrations for the marks in question. Doc. 78, Pl.'s App., 46–49, 59–73 (trademark registrations for associated marks). Thus, as they relate to similarity, Defendants' complaints are unavailing.

advertised in the same manner. Doc. 114, Pl.'s Reply, 14 (comparing screenshots of the Firebirds Wood Fired Grill website and Firebird Restaurant Group).

The similarity of the services may be limited to the fact that both sides are involved in the restaurant industry. Defendants do not have brick-and-mortar restaurants that display their FRG mark; Plaintiffs do. While courts in this circuit sometimes overlook minor distinctions when services are related, it is unclear at this stage whether this distinction is minor. Often times, courts will do so when the "junior user's services are in a market that is one into which the senior user would naturally expand." *Elvis Presley Enters.*, 141 F.3d at 202. The actual intent to expand is irrelevant in this inquiry; instead, the focus is on whether a consumer would believe such an expansion is natural, even if this belief is false. *Id.* Plaintiff does not make this argument here, however. Rather, Plaintiff argues that because there has been actual confusion between the two marks, the services must be similar. But that's not the point of this inquiry. The Court finds that fact issues exist as to the differences in the parties services that cannot be resolved at this stage. As such, this factor favors neither party.

*(4) Outlet and Purchaser Identities*—"The greater the overlap between the outlets for, and consumers of, the services, the greater the potential for confusion." *All. for Good Gov't*, 901 F.3d at 512. This factor seems to be affected by the same factual dispute as the third factor—Plaintiff's main consumers are restaurant goers; Defendants' are purportedly the brand restaurants they operate. There is evidence that the parties share similar vendors and suppliers, but Defendants argue that is irrelevant to this factor. Plaintiff does not respond. Further, even if the restaurant goers of Defendants' brand restaurants can be characterized as Defendants' consumers, fact issues remain because the food types these brand restaurants offer do not appear to be similar and the locations of

the parties' restaurants have little overlap. If anything, this factor weighs in Defendants' favor at this stage.

(5) *Advertising Media Identities*—"The greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion." *Dallas Cowboys Football Club, Ltd. v. Am.'s Team Props., Inc.*, 616 F. Supp. 2d 622, 639 (N.D. Tex. 2009) (alterations incorporated) (quoting *Quantum Fitness*, 83 F. Supp. 2d at 827). Plaintiff advertises its goods and services under the Firebirds mark through in-restaurant marketing, internet marketing (*e.g.*, website, social media, online review websites), magazines, press releases, and sponsorship of events and charities. Doc. 77, Pl.'s Br., 25. Defendants dispute that their advertising media is similar. They start by arguing that they do not advertise with their FRG mark. Doc. 98, Defs.' Resp., 32. Their claim is that because Firebird Restaurant Group does not offer any goods or services that can be purchased, there is nothing for Defendants to advertise. *Id.* Defendants seem to argue, in the alternative, that even if their use of the FRG mark could be considered advertising, the ways in which they use it in advertising do not resemble the ways in which Plaintiff uses its mark. *Id.* at 32–35.

The Court finds that this factor leans slightly in Plaintiff's favor. First, the Court does not put much stock into Defendants' argument that they do not advertise under the FRG mark—Plaintiff has provided ample evidence both that the mark is used in connection with Defendants' advertising of their restaurant group and that Defendants have contracted with third-party marketing companies to advertise its mark. Doc. 77, Pl.'s Br., 25 (citing Doc. 78, Pl.'s App., 180–226 (collecting examples of FRG mark use in online, social media, and in-restaurant ads), 238–47 (use in connection with charity event), 587–88 & 589–94 (use on Glassdoor and Indeed)). Defendants counter that this

advertising evidence is "minimal" and that they have discontinued use of the mark with charity events and on brand restaurant menus. Doc. 98, Defs.' Resp., 33–34. Even if this evidence were considered minimal, it is some evidence that the parties advertise their marks in similar ways, and thus pushes this factor in Plaintiff's favor.

(6) *Defendants' Intent to Confuse*—"Proof of an intent to confuse the public is not necessary to a finding of a likelihood of confusion, but if a mark was adopted with the intent to confuse the public, that alone may be sufficient to justify an inference of likelihood of confusion." *Houston Coll. of Law*, 214 F. Supp. 3d at 590 (cleaned up) (quoting *Elvis Presley Enters.*, 141 F.3d at 203). "If there is no evidence of intent to confuse, then this factor is neutral." *Viacom Int'l*, 891 F.3d at 195. Courts in this circuit focus "on whether the defendant intended to derive benefits from the reputation of the plaintiff." *Streamline*, 851 F.3d at 455. "But mere awareness of the senior user's mark does not establish bad intent." *Id.* at 456 (cleaned up) (quoting *Conan Props.*, 752 F.2d at 150).

Here, Plaintiff argues that Defendants "knew of Firebirds' well established trademark rights before adopting and using their infringing 'Firebird' marks, and yet they decided to proceed anyway." Doc. 77, Pl.'s Br., 27. Other courts have found similar evidence insufficient to support a finding in favor of a plaintiff at the summary-judgment stage. *See Viacom Int'l*, 891 F.3d at 196; *Ultimate Living Int'l, Inc. v. Miracle Greens Suppl., Inc.*, 2007 WL 14258 (N.D. Tex. Jan. 3, 2007). This Court does the same and finds that Defendants' awareness of the Plaintiff's mark, coupled with continued use after awareness, is not sufficient to establish bad intent at this stage. This factor is thus neutral.

(7) *Evidence of Actual Confusion*—Actual confusion is the "best evidence of a likelihood of confusion." *Viacom Int'l*, 918 F.3d at 197 (quoting *Elvis Presley Enters.*, 141 F.3d at 203–04). "Even

if initial consumer confusion is quickly dispelled, this initial misunderstanding is evidence of confusion." *Id.* "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." *Id.* Importantly, "very little proof of actual confusion" is needed to establish a likelihood of confusion. *Streamline*, 851 F.3d at 457 (quoting *Xtreme Lashes*, 576 F.3d at 229). "Testimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion." *Id.* (citing *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984)). "However, not all confusion counts: evidence of actual confusion must show more than a fleeting mix-up of names; rather it must show that the confusion was caused by the trademarks employed and it swayed consumer purchases." *Id.* (internal quotations omitted and alterations incorporated) (quoting *Xtreme Lashes*, 576 F.3d at 230). This does not mean that a proponent of such evidence is required to show lost profit associated with the instances of confusion. *Id.* at 457–58.

Plaintiff brings forth both anecdotal evidence of confusion and consumer surveys. Starting with the anecdotal evidence, Plaintiff points to twenty instances of alleged confusion. Most of these, as Defendants repeatedly stress, are not instances of consumer confusion but vendor, supplier, or third-party confusion. Doc. 77, Pl.'s Br., 28–31 (listing instances of actual confusion). For example, the first few examples of confusion are from: (1) headhunters contacting Plaintiff in attempts to contact Defendants' executives; (2) sales associates at Adobe emailing Plaintiff about Defendants' marketing strategies; (3) Glassdoor posting Plaintiff's mark on Defendants' job posting; and (4) industry professionals questioning whether the companies were associated. *Id.* at 28–29. Other examples include purported confusion from marketing agencies, collections agents, real estate agents,

vendors, and employees. *Id.* at 29–31. It seems like the only noted instances of consumer confusion were two customer reviews, one mistakenly sent to FRG and one to Firebirds. *Id.* at 30. Both of these occurred through the parties' respective websites. *Id.*

Plaintiff first argues that its evidence of confusion from vendors and other nonpurchasing third parties should still weigh in its favor. While there is support for this proposition in this circuit, courts discount this nonpurchaser confusion in their weighing of this factor. Take *Healix Infusion Therapy, Inc. v. Healix, Inc.*, 2018 WL 1801149, at *19 (S.D. Tex. Apr. 16, 2018), for example. In this case, the plaintiff (very similarly) complained of instances of confusion stemming from Glassdoor and Indeed posting the incorrect logos on its website; job recruiters soliciting the wrong company's executive; and a company asking to clarify its vendor number. *Id.* The defendant argued that this evidence was irrelevant because it showed only nonconsumer confusion. *Id.* The district court disagreed, holding that "[a]lthough this evidence may not weigh as heavily as evidence of confusion by customers that affected purchases, it is a factor of finding a likelihood of confusion." *Id.*; *see also id.* at *18 (collecting Fifth Circuit cases supporting this holding). The court went on to find that this factor weighed, at best, slightly in the plaintiff's favor, and it denied plaintiff's motion for summary judgment on its trademark claim. *Id.* at *20–21.

The Court finds *Healix*'s analysis directly applicable here. While Plaintiff's anecdotal evidence cannot be completely discounted, the Court will give it less weight than evidence of consumer confusion. Moreover, the Court agrees with Defendants that the examples Plaintiff has given of purported consumer confusion do not seem to indicate consumer purchases were swayed; rather, these incidents more closely resemble "fleeting mix-ups" of names in attempting to contact Firebirds.

In sum, although Plaintiff has amassed a not-insubstantial amount of actual confusion evidence, it does not push Plaintiff over its summary-judgment burden. At this point, looking at this evidence in a light most favorable to Defendants, it seems that this anecdotal evidence tips the scales only slightly in Plaintiff's favor.

As for the survey evidence, Plaintiff claims its expert's survey "corroborates what common sense and the numerous instances of actual confusion prove." Doc. 114, Pl.'s Reply, 16. Defendants respond that Plaintiff's survey is riddled with errors, rendering it inadmissible. Doc. 98, Defs.' Resp., 41. These arguments are developed in greater detail in the parties' briefing on Defendants' motion to exclude testimony from Plaintiff's expert. *See* Doc. 92, Defs.' Br. Mot. to Exclude Testimony of Dr. Klein. The Court will address the admissibility of Dr. Klein's testimony and survey in deciding that motion. With respect to deciding this motion, the Court finds that Plaintiff's argument that the survey corroborates actual confusion is somewhat muffled by the fact that Plaintiff has pointed to zero instances of consumer confusion that swayed purchases. Therefore, the survey does not actually corroborate any *consumer* confusion. And the survey group, which was designed to target potential customers of Defendants' brand restaurants, does not seem to overlap with any of the categories of persons Plaintiff identifies as being actually confused by the marks. Finally, the persistent fact issue related to the distinction between the parties' customer bases and services also comes into play here. *See* Doc. 92, Defs.' Br. Mot. to Exclude, 8–10 (arguing Klein sampled the wrong universe because he sampled consumers of the brand restaurants, as opposed to Defendants' consumers, *i.e.* restaurants). Construing this evidence in favor of the nonmovant Defendants, the Court concludes

that it cannot weigh this contested survey evidence in Plaintiff's favor here.[8]

To conclude, the Court finds that this factor weighs slightly in Plaintiff's favor based on the instances of actual confusion amongst nonconsumers.

*(8) Care Exercised by Potential Customers*—"Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Xtreme Lashes*, 576 F.3d at 231 (quoting *Smack Apparel*, 550 F.3d at 483). Plaintiff argues this factor weighs in its favor because the concept of its restaurants is to provide upscale dining at an affordable price point. Doc. 77, Pl.'s Br., 35. Defendants continue to rely on the argument that their customers are not restaurant goers but restaurant businesses needing management services, and thus their customers are making informed, deliberative decisions when contracting with them. Doc. 98, Defs.' Resp., 42. The Court believes that this reoccurring fact issue is best resolved at trial. Thus, this factor is neutral.

*(9) Weighing the Digits of Confusion*—Weighing all of the factors together, the Court concludes that fact issues preclude the Court from granting summary judgment in Plaintiff's favor. Only a few factors—the conceptual strength of Plaintiff's mark, the similarity of the marks, and the advertising similarity—seem to definitively point to a likelihood of confusion. Other factors—*e.g.*, commercial strength, actual confusion, similarity of the services—have factual disputes that the Court finds are material and unresolvable at this stage. This includes the factual issue over whether the parties actually compete with one another, which touches almost all the likelihood-of-confusion digits. In all, while the weighing tilts slightly in Plaintiff's favor, the Court finds that there are

---

[8] It may be that Plaintiff's expert's testimony and survey evidence ultimately supports this factor at trial. The Court makes this note to clarify that nothing in this Order should be construed as affecting the admissibility or weight of that study (if it is found admissible)—such determinations will be made by the Court on Defendants' motion to exclude and, if appropriate, by the factfinder at trial.

sufficient issues of material fact related to the likelihood-of-confusion test to proceed to trial.[9] Plaintiff's motion is denied.

B.    *Defendants' Motion for Partial Summary Judgment*

Defendants seek summary judgment on (1) Plaintiff's claim to recover an award of profits and actual damages under the Lanham Act and (2) Plaintiff's unjust enrichment claim. Doc. 73, Defs.' Mot. The Court addresses each in turn, viewing the evidence and inferences in a light most favorable to Plaintiff.

1.    Lanham Act Remedies

The Court starts with Defendants' arguments related to damages. Under the Lanham Act, a plaintiff who established infringement "shall be entitled . . . subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a). "[S]uch monetary damages 'shall constitute compensation and not a penalty.'" *Streamline*, 851 F.3d at 459 (quoting 15 U.S.C. § 1117(a)). "[M]onetary damages are not warranted in trademark infringement cases if '[a]n injunction alone . . . fully satisfies the equities of a given case.'" *Id.* (some alterations in original) (quoting *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000)). "This is 'particularly [true] in the absence of a showing of wrongful

_____

[9] Defendants requested that the Court strike portions of affidavits submitted as evidence in support of Plaintiff's motion for summary judgment. *See* Doc. 100, Mot. to Strike. In this motion, Defendants argue that portions of Mark Eason and Dennis Thompson's affidavits contradict statements they previously made in depositions. Doc. 101, Defs.' Br. Mot. to Strike, 2. The challenged portions relate to when the first Firebirds restaurant opened. *Id.* Even though the Court's Order does not hinge on these specific statements, the Court finds Defendants' motion meritless. It is apparent that Defendants have selectively cited (or even failed to cite) to portions of the affiants' depositions that seemingly conflict with the statements made in their affidavits. Upon review of the affidavits and the witnesses' earlier testimony, the Court finds no meaningful conflict with the statements. Defendants' motion to strike (Doc. 100) is **DENIED**.

intent,' or if there is a 'lack of sufficient proof of actual damages.'" *Id.* (alterations in original) (quoting *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 917 (Fed. Cir. 1984) and *Seatrax, Inc.*, 200 F.3d at 372). "Though the district court has discretion in determining an equitable damages award, genuine disputes concerning material facts, such as the actual amount of damages or the willfulness of infringement may still preclude a summary judgment award of damages." *Choice Hotels Intern., Inc. v. Patel*, 940 F. Supp. 2d 532, 543–44 (S.D. Tex. 2013). The Court first addresses Plaintiff's claim for Defendants' profits, then Plaintiff's claim for actual damages.

i.      *Fact Issues Preclude Summary Judgment as to Defendants' Profits*

Defendants spend the majority of their summary judgment brief contesting Plaintiff's claim for profits. The Lanham Act expressly provides for recovery of a defendant's profits. It also provides a formula for recovery of such profits: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Courts interpret this to mean that "a plaintiff must prove defendant's sales in order to determine a defendant's profits, and if a plaintiff can prove a defendant's sales, then the defendant has the burden to prove any costs or deductions it claims." *ClearChoice Holdings, LLC v. Clear Choice Dental, PLLC*, 2016 WL 8136622, at *6 (S.D. Tex. Dec. 23, 2016) (citing *Am. Rice.*, 518 F.2d at 337).

Additionally, the Fifth Circuit has held that "the remedies under Section 1117(a) 'are awarded subject to the principles of equity, and thus, an award of the defendant's profits is not automatic.'" *Id.* (quoting *Am. Rice*, 518 F.3d at 338). To decide whether an award of profits is equitable, courts in this circuit look to the following six factors:

> (1) Whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Quick Techs., Inc. v. Sage Grp., PLC*, 313 F.3d 338, 347 (5th Cir. 2002) (acknowledging adoption of factors in *Pebble Beach Co. v. Tour 18 Ltd.*, 155 F.3d 526 (5th Cir. 1998)). These factors are "non-mandatory and non-exclusive: the district court is free to consider other facts in assessing whether disgorgement of profits would be equitable, just as it may exercise discretion in weighing the individual factors." *Retractable Tech., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 876 (5th Cir. 2019) (citing *Quick Techs.*, 313 F.3d at 347). However, even if these factors favor disgorgement, a "plaintiff is 'entitled to only those profits attributable to the unlawful use of its trademark.'" *ClearChoice*, 2016 WL 8136622, at *6 (quoting *Seatrax*, 200 F.3d at 369).

The Court need not wade through all the evidence related to each of the above factors to determine that a fact issue precludes summary judgment on this issue. One of the key factors here is whether Defendants willfully infringed on Plaintiff's mark—*i.e.* whether they intended to confuse or deceive. *See Quick Techs.*, 313 F.3d at 349 ("It is obvious from our cases that willful infringement is an important factor which must be considered when determining whether an accounting of profits is appropriate."). Above, the Court considered Defendants' intent in the context of likelihood of confusion—the Court found that when the evidence was considered in the light most favorable to Defendants, it did not weigh in favor of finding a likelihood of confusion. Here, by comparison, the Court must draw all inferences in Plaintiff's favor.

Defendants argue that there is no evidence that shows they intended to confuse or deceive. Doc. 73, Defs.' Br., 20–21. Specifically, they assert that Plaintiff's evidence shows only that they were

aware of Plaintiff's mark yet continued to use the FRG mark despite this awareness. *Id.* at 20–24. Defendants claim that the Fifth Circuit has found, as a matter of law, that such evidence is insufficient to prove bad intent. *Id.* at 22–23 (citing *Streamline*, 851 F.3d at 455–56, 465). Plaintiff responds that the evidence of constructive and actual notice is sufficient, in this case, to show Defendants' intent to infringe. Doc 96-1, Pl.'s Resp., 19–22. Plaintiff also argues that other evidence—*e.g.*, purported misrepresentations to the USPTO and recent marketing of a new restaurant that is similar to Plaintiff's—would also support a jury's verdict on this issue. *Id.* at 22–25.[10]

The Court first notes that Defendants have not pointed to a case where a court in this circuit granted summary judgment against a nonmovant's claim for profits or damages when presented with similar evidence. This makes sense as Lanham Act damages are based on principles of equity that are better fit for resolution after trial. Instead, Defendants rely on *Streamline*. But both the facts and procedural posture of that case differ from those here. In *Streamline*, the Fifth Circuit vacated a jury's damages award after a full trial on the merits. 851 F.3d at 463–64. The court did not review an award for profits, but instead awards for royalties, unjust enrichment, and exemplary damages. *Id.* at 459. The court held that the evidence presented at trial did not support a finding that the

---

[10] Additionally, Plaintiff makes an argument that because it owns an incontestable registration for its mark, the burden of proof on wrongful intent shifts to Defendants—*i.e.* Defendants must prove that they did not have the intent to infringe. Doc. 96-1, Pl.'s Resp., 19–20. Plaintiff relies on one case for this proposition: *Waples-Platter Companies v. General Foods Corp.*, 439 F. Supp. 551 (N.D. Tex. 1977). But that case stated that "where the allegedly infringing mark is shown to be confusingly similar to the registered mark, and its use began subsequent to registration, the defendant must carry the burden of explanation and persuasion." *Waples-Platter*, 439 F. Supp. at 574. That is not the situation here, however, where Plaintiff has not yet shown that the marks are confusingly similar. Moreover, this burden-shifting rule seems to be derived from a Second Circuit case. *See id.* (citing *Kiki Undies Corp. v. Promenade Hosiery Mills, Inc.*, 411 F.2d 1097 (2d Cir. 1969)). Based on this Court's research, no other court in this circuit has relied on these cases for this rule. The Court thus rejects Plaintiff's argument that it applies here.

defendant intended to infringe on the plaintiff's mark. *Id.* at 464. But the evidence in question was limited to "[defendant's] conduct after learning about [plaintiff's] existence and [defendant's] failure to change its name until [plaintiff] filed suit." *Id.* at 456. No evidence was presented that the defendant was aware of plaintiff's mark at the time it choose its name or that the plaintiff's mark was registered at that time. *Id.* Further, there was no evidence that *after* the defendant learned of the plaintiff that it did anything differently in an attempt to "pass off" its product as the plaintiff's. *Id.* Thus, the court held that this factor weighed against finding a likelihood of confusion. *Id.* at 456–57.

So, *Streamline* is not directly applicable to the Court's resolution of this motion because here the Court must draw all inferences in Plaintiff's favor and because the available evidence on intent differs. Specifically, Plaintiff had a valid federal trademark registration seven years before Defendants chose the name Firebird Restaurant Group. Doc. 96-1, Pl.'s Resp., 20. And, in 2008, Plaintiff's founder, Dennis Thompson, sent a letter to Karns informing him of the similarity of the marks and potential confusion between them. Doc. 96-2, Pl.'s App., 130. In 2013, Defendants started using the FRG mark as a logo (as discussed above, Plaintiff argues this was a "rebranding"), and sought to register the mark with the USPTO. Doc. 96-1, Pl.'s Resp., 21. Additionally, during the application process for the registration, Defendants' attorney notified them of the Firebirds mark. *Id.* Plaintiff argues that this "rebranding" is evidence of intent because Defendants were on constructive notice based on Plaintiff's registration and actual notice from Thompson's letter and their attorney. *Id.* at 21–22. Thus, if looked at in the light most favorable to Plaintiff, the evidence seems to show that Defendants decided to start using the FRG mark as a trademark in 2013 with full awareness that it was similar to, and maybe even confusingly similar to, the Firebirds mark. This kind of evidence is

specifically what the *Streamline* court noted was lacking from the intent evidence there. *See* 851 F.3d at 456. While "mere awareness" of the senior user's mark is not always sufficient to establish bad intent, "[i]n some situations, the defendant's use of the mark with 'knowledge' of the senior user's mark 'may give rise to a presumption that the defendant intended to cause public confusion.'" *Id.* at 455–56 (quoting *Conan Props.*, 752 F.2d at 150 and *Scott Fetzer*, 381 F.3d at 486 ). A reasonable juror could find such is the case here.

Turning to the other five factors, the Court finds none are fatal to Plaintiff's claim for profits. The factor that seems to be the most trouble for Plaintiff is whether sales have been diverted. As Defendants point out, Plaintiff has presented no evidence that is has lost any sales, let alone that its sales have been diverted to Defendants. Doc. 110, Defs.' Reply, 5. Instead, Plaintiff argues that its evidence of actual confusion is relevant in determining diverted sales. Doc. 96-1, Pl.'s Resp., 26. The problem with this argument, as detailed above, is that almost all of Plaintiff's actual-confusion evidence stems from third-party confusion, not consumer confusion. Further, the few instances of consumer confusion do not appear to be instances of purchaser confusion. Thus, even when viewed in Plaintiff's favor, this evidence does not seem to show sale diversion. All that to say, this is not fatal to a claim for damages. The *Pebble Beach* factors are "non-mandatory" and "non-exclusive." *Retractable Tech.*, 919 F.3d at 876. It may still be that a reasonable jury could find that other factors support an award of profits even if this factor is not shown. And the remaining four factors could cut in either side's favor depending on what evidence comes out at trial. Thus, resolution of this issue is best left to jurors.

ii.     *Fact Issues Preclude Summary Judgment as to Actual Damages*

Turning to actual damages, Plaintiff seeks compensation in the form of a reasonable royalty and corrective advertising costs. Doc. 96-1, Pl.'s Resp., 25. The Court starts with the request for royalty damages. "While not explicitly provided for in the Lanham Act, [the Fifth Circuit has] permitted trademark infringement damages on the basis of the royalty rate normally charged for licensing the unauthorized use of the mark, on the logic the plaintiff sustained damages equal to the profit they could have made from such a license." *Streamline*, 851 F.3d at 459. "Usually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on." *Id.* (quoting *Choice Hotels*, 940 F. Supp. 2d at 546).

Defendants argue that a reasonable royalty is not permissible here because the parties had no licensing agreement nor negotiations for one. Doc. 73, Defs.' Br., 32. But that is not a rule in this circuit. *Choice Hotels Int'l, Inc. v. Goldmark Hosp., LLC*, 2014 WL 642731, at *14 (N.D. Tex. Feb. 19, 2014) (holding that a prior licensing agreement between the parties was not a prerequisite to a claim for reasonable royalty damages for trademark infringement); *see also Streamline*, 851 F.3d at 460–61 (declining to address whether royalty awards are limited to cases where the parties had prior licensing negotiations or agreements). The rule is that a "royalty-based damages award must be rationally related to the scope of the defendant's infringement." *Streamline*, 851 F.3d at 461 (citing *Boston Prof'l Hockey Ass'n, Inc. v. Dall. Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 75–76 (5th Cir. 1979)).

Defendants also argue that a royalty-based reward is not appropriate because Plaintiff has not suffered actual damages. However, as stated above, the damages for a royalty award are based on "the

logic that the plaintiff sustained damages equal to the profit they could have made from such a license." *Id.* at 459 (citing *Boston Prof'l*, 597 F.2d at 75–76). The *Streamline* court held that royalty-based damages were inappropriate because: (1) the plaintiff's expert did not discuss what portion of the defendant's profits was attributable to the infringing use or the scope of the defendant's use relative to the rights it would have received with a license; and (2) the jury found that the plaintiff failed to show that the defendant profited from the infringing use. *Id.* at 461. Here, starting with the latter reason, the Court has already held that a fact issue exists as to Plaintiff's claim for Defendants' profits. And as for the former, unlike the expert in *Streamline*, Plaintiff's expert has tied his opined royalty rate to Defendants' financials and to the portion of their profit attributable to the allegedly infringing conduct. Doc. 96-2, Pl.'s App., 607–09. While these figures are based on the assumption that Defendants operate as a single economic entity, the Court does not resolve that fact issue here. Nor does the Court opine on whether the expert's estimation is appropriate. The Court simply holds that summary judgment is not warranted on Plaintiff's claim for royalty-based damages.

As for corrective advertising costs, the purpose of this award is to "counteract the public confusion resulting from a defendant's trademark infringement." *ClearChoice Holdings*, 2016 WL 8136622, at *5 (alterations incorporated) (quoting *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374–75 (10th Cir. 1977)). Corrective advertising damages can include costs spent pre-trial or prospective costs. *Id.* at *6. Both parties fleetingly discuss this damages category. While the Court is skeptical that Plaintiff has any evidence of prior or prospective corrective advertising costs, the Court reserves a ruling on this issue until after the evidence is presented.

Defendants' request for summary judgment on Plaintiff's claim for actual damages is denied.

## 2. Unjust Enrichment Claim Is Not an Improper Recasting of Lanham Act Claim

Finally, Defendants seek summary judgment on Plaintiff's unjust enrichment claim. Doc. 73, Defs.' Br., 33. Defendants rely on a case from this district that granted summary judgment on an unjust enrichment claim because the plaintiff in that case had "other, more specific theories of recovery available," including a claim for trademark infringement. *Mary Kay, Inc. v. Weber*, 601 F. Supp. 2d 839, 864 (N.D. Tex. 2009). However, such awards have been permitted by the Fifth Circuit. *See Maltina Corp. v. Cawy Bottling Co.*, 613 F.2d 582, 585 (5th Cir. 1980) (affirming district court's unjust enrichment award on the basis of defendant's willful infringement). The Fifth Circuit has also rejected unjust enrichment claims in trademark infringement cases for insufficient evidence, but not because the claims were inappropriate as a matter of law when a Lanham Act claim was brought. *See Streamline*, 851 F.3d at 462–63 (vacating unjust enrichment award where there was no evidence that the defendant attempted to "palm off" its goods as the plaintiff's or that the defendant's infringement was willful); *see also Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 694–96 (5th Cir. 1992). It may be that Plaintiff will not be able to present sufficient evidence of unjust enrichment or that Plaintiff will not be able to recover under all its damages theories. But the Court finds that a claim for unjust enrichment does not fail, as a matter of law, at this stage simply because Plaintiff brings a Lanham Act claim.

## IV.

## CONCLUSION

For the aforementioned reasons, the Court rules as follows:

(1)    Plaintiff's partial motion for summary judgment as to liability (Doc. 71) is **DENIED** without prejudice to reasserting the same arguments after presentation of the evidence at trial;

(2)    Defendants' partial motion for summary judgment on damages (Doc. 72) is **DENIED** without prejudice to reasserting the same after presentation of the evidence at trial; and

(3)    Defendants' motion to strike (Doc. 100) is **DENIED**.

**SO ORDERED.**

**SIGNED: August 15, 2019**.

_____

**JANE J. BOYLE**
**UNITED STATES DISTRICT JUDGE**