UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| FIREBIRDS INTERNATIONAL, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:17-CV-2719-B |
| | § | |
| FIREBIRD RESTAURANT GROUP, LLC, ET AL., | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion to Strike the Report and Opinions of Robert Klein (Doc. 91). Plaintiff commissioned an expert to design, conduct, and analyze a survey measuring the likelihood of confusion between the parties because of Defendants' use of the mark "Firebird." Defendant now seeks to exclude the expert's testimony on the basis that his survey's methodology was so flawed that it is not reliable or relevant. Because the Court finds that the survey's deficiencies go to the survey's weight, not its admissibility, Defendants' Motion (Doc. 91) is **DENIED**.

## I.

## BACKGROUND

This is a trademark infringement case brought under the Lanham Act and Texas common law. Plaintiff Firebirds International, LLC ("Firebirds") and Defendants Firebird Restaurant Group ("FRG"), Firebird IP, LLC, and Michael D. Karns are in the restaurant industry. Plaintiff owns and operates nearly fifty restaurants, all of which bear the mark FIREBIRDS®. Doc. 78, Pl.'s App. in Supp. of Mot. for Summ. J. ("Pl.'s App."), 1–2 ¶¶ 2 & 5. Plaintiff's restaurants are located throughout

- 1 -

the United States. *Id.* at 1, ¶ 3. Plaintiff plans to expand into Texas. *Id.* at 2, ¶ 4.

FRG is a restaurant management company, owning[1] and operating more than fifty restaurants under six brands: El Fenix Mexican Restaurant, Snuffer's Restaurant & Bar, Village Burger Bar, Meso Maya, Taqueria La Ventana, and TorTaco. *Id.* at 163, 266. FRG's restaurants are located in northern Texas and southern Oklahoma. Doc. 1, Pl.'s Compl., 2 ¶ 6. Plaintiff contends FRG uses "Firebird" as its "mother brand." Doc. 77, Pl.'s Br. in Supp. of Mot. for Summ. J., 8.

On October 4, 2017, Firebirds filed this lawsuit, asserting claims against Defendants for, inter alia, trademark infringement. *See* Doc. 1, Compl. Plaintiff retained as an expert witness Robert Klein, who conducted an Internet survey purportedly "measur[ing] the likelihood of confusion between Firebirds and FRG caused by FRG's use of the mark 'Firebird.'" Doc. 93-2, Expert Report of Robert L. Klein ("Klein Report"), 4.

A brief overview of Klein's survey is in order. Klein's survey was conducted over the Internet. *Id.* at 5. Respondents were Texas residents at least 18 years of age who indicated they are likely to visit a causal restaurant that serves American or Mexican cuisine in the near future. *Id.* Respondents participated in a survey consisting of three stages. In the first stage, participants were shown FRG's webpage. *Id.* at 11; *Id.* at 8, Ex. 1. (Respondents assigned to the control group were shown an identical webpage, except every instance of "Firebird Restaurant Group" was replaced with "Tanager Restaurant Group." *Id.* at 9, Ex. 2.) In the second stage, participants answered a series of distractor questions. *Id.* at 12. In the third and final stage, participants were shown the webpages for three restaurants, including Plaintiff's. *Id.* at 12; *Id.* at 13, Ex. 3; *Id.* at 14, Exs. 4–5. After viewing each

---

[1] The Court notes that the parties characterize the ownership of the Brand Restaurants differently.

webpage, respondents were asked: "Do you believe this restaurant **is part of** the restaurant group whose webpage you saw in the first section of this survey or do you believe **it is not part of** the restaurant group . . . ?" *Id.* at 15. Respondents selected "is part of," "is not part of," or "Don't know/Unsure." *Id.* Those who answered "is part of" were prompted to explain, in their own words, why. *Id.* Those who answered "is not part of" or "Don't know/Unsure" were asked: "Do you believe this restaurant **has** a business connection or affiliation with the restaurant group whose webpage you saw in the first section of this survey or do you believe it **does not have** a business connection or affiliation with the restaurant group . . . ?" *Id.* at 15–16. Respondents selected "has," "does not have," or "Don't know/Unsure." *Id.* at 16. Those who answered "has" were prompted to explain, in their own words, why. *Id.* Then the survey concluded.

The results were collected. In the test group, 78.4% of respondents indicated they believed Plaintiff was "part of" FRG or that the companies have a "business connection or affiliation" with each other. *Id.* at 17–18. By contrast, in the control group, only 21.1% indicated they believed Plaintiff was "part of" Tanager Restaurant Group or that the two have a business connection or affiliation with each other. *Id.* at 18. Subtracting the two percentages, Klein obtained a "net confusion" of 57.4%. *Id.*

Defendants retained Dr. Itamar Simonson to respond to the Klein Report. *See* Doc. 93-6, Expert Rebuttal Report of Dr. Itamar Simonson ("Simonson Report"). Simonson's rebuttal purports to identify several flaws in Klein's survey, concluding that it was "an artificial exercise that had nothing to do with reality." *Id.* at 8 ¶ 20

Defendants now move to exclude Klein's testimony.

# II.

# LEGAL STANDARD

Federal Rule of Evidence 702 provides for testimony by an expert witness if: (1) that witness is "qualified as an expert by knowledge, skill, experience, training, or education"; (2) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (3) "the testimony is based on sufficient facts or data"; (4) "the testimony is the product of reliable principles and methods"; and (5) "the expert has reliably applied the principles and methods to the facts of the case." The "testimony is admissible only if it is both relevant and reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). The party offering expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony satisfies Rule 702. *See Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

"The court decides these motions in its role as gatekeeper concerning the admissibility of expert testimony." *Hall Arts Ctr. Office, LLC v. Hanover Ins. Co.*, 327 F. Supp. 3d 979, 1001 (N.D. Tex. 2018) (Fitzwater, J.) (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002)). "[W]hile exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits." *Id.* (quoting *Pipitone*, 288 F.3d at 250). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

"In assessing the validity of a survey, [courts in the Fifth Circuit] look to two factors: first, the manner of conducting the survey, including especially the adequacy of the universe; and second,

the way in which participants are questioned." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (citing *Exxon Corp. v. Tex. Motor Exch. of Houston, Inc.*, 628 F.2d 500, 506–07 (5th Cir. 1980)). "For a survey to be valid, 'the persons interviewed must adequately represent the opinions which are relevant to the litigation.'" *Id.* (quoting *Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 264 (5th Cir. 1980)). "In an infringement action, the appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged infringer's goods or services." *Id.* at 487–88 (internal quotation marks and citation omitted). Finally, as a general rule, "methodological flaws in a survey bear on the weight the survey should receive, not the survey's admissibility." *Id.* at 488. "In some cases, however, serious flaws in a survey will make any reliance on that survey unreasonable." *Id.* And "although minor methodological flaws will affect weight rather than admissibility, a survey can be so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *Id.* (internal quotation marks and citation omitted).

## III.

## ANALYSIS

Defendants contend Klein's opinions must be excluded for five reasons: (1) asking the wrong questions of the wrong universe; (2) failing to accurately replicate market conditions; (3) improperly assuming consumers were aware of FRG; (4) improperly suggesting an affiliation between Firebirds and FRG; and (5) not using a proper control. Doc. 129, Defs.' Reply, 1–2. The Court addresses each of these in turn.[2]

---

[2] Defendants do not challenge Klein's qualifications as an expert. Doc. 122, Pl.'s Resp., 5.

A.  *Methodology*

Defendants first contend that Klein did not employ the correct methodology—*i.e.* he did not sample the proper universe or ask the proper questions—to determine either forward or reverse confusion. *Id.* at 2–3. The Court first looks at the universe of respondents then to the questions asked.

1.  Universe of Respondents

Defendants argue that Klein selected the wrong universe of respondents because he surveyed potential customers of Defendants' brand restaurants, instead of Defendants' actual potential customers—other restaurants. *Id.* at 3. Defendants contend that since Klein did not define the proper universe, the results of his survey are not relevant and must be excluded. *Id.* In response, Plaintiff maintains that the proper universe of respondents are potential customers of the Brand Restaurants, and that Klein properly sampled this group. Doc. 122, Pl.'s Resp., 8–9. In any event, Plaintiff argues that since this dispute relates to a question of fact, not a question of law, it would be improper for the Court to resolve it in the context of a *Daubert* motion. *Id.* at 9.

Both parties agree that to evaluate the propriety of Klein's universe, the Court needs to determine who are "those purchasers most likely to partake of [Defendants'] goods or services." *Scott Fetzer Co.*, 381 F.3d at 488. But, as the Court held in its order denying the parties' motions for summary judgment, this is a question of fact best left for trial. *See Hanover*, 327 F. Supp. 3d at 1001 ("[W]hile exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits."); Doc. 156, Order. Further, as Plaintiff notes, even if it is later found that Defendants' customers are solely restaurant businesses, Klein's survey may still be admissible to show a likelihood of confusion. *See* J. Thomas McCarthy, 6 *McCarthy on Trademarks*

*and Unfair Competition* § 32:162 (5th ed. 2019) (hereinafter, "McCarthy on Trademarks") ("In most cases, the selection of an inappropriate universe will lessen the weight of the resulting survey data, not result in its admissibility.").

2.  Survey Questions

In addition to criticizing the survey's universe, Defendants contend that Klein should have asked the respondents whether they believed that Defendants' services belong to Plaintiff, instead of asking whether they believe that Plaintiff is part of FRG. Doc. 129, Defs.' Reply, 4. Defendants argue that Klein's failure to ask the question in this manner means that his survey cannot help establish "forward confusion." *Id.* at 4–5.

But a plaintiff alleging trademark infringement is not required to specify forward or reverse confusion under the Lanham Act.[3] Indeed, "confusion that is remedied by trademark and unfair competition law is confusion not only as to source, but as to affiliation, connection or sponsorship." 4 *McCarthy on Trademarks* § 23:8. Here, the purpose of Klein's survey was to determine whether consumers who are most likely to partake in Defendants' services "will mistakenly believe that Firebirds is part of FRG or will believe that Firebirds and FRG have a business connection or affiliation." Doc. 93-2, Pl.'s App., 106 (Klein report). Klein asked respondents both whether Firebirds "is part of" or "not part of" FRG and whether Firebirds "has a business connection or affiliation with" FRG. Thus, the manner in which Klein asked questions to the survey respondents is not fatal to the

---

[3]Section 43(a) of the Lanham Act provides: "Any persons who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof . . . which is likely to cause confusion, or to cause mistake, or to deceive *as to the affiliation, connection, or association* of such person with another person, *or as to the origin, sponsorship, or approval* of his or her goods, services or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act." 15 U.S.C. § 1125 (emphasis added).

survey's admissibility. Defendants' objections related to forward and reverse confusion are unavailing.

B.  *Replication of Market Conditions*

Defendants next argue that Klein failed to reasonably replicate the marketplace in which Plaintiff's and Defendants' marks are encountered. Doc. 129, Defs.' Reply, 6. They claim to identify several flaws in Klein's attempt to replicate market conditions—for example, the survey respondents viewed only the parties' homepages, Klein presented those pages sequentially without establishing that consumers would view both pages, and use of a sequential survey was improper because "the nearest [Firebirds] location is two hours from any of Defendants' Brand Restaurants." *Id.* at 6–7. As a result, Defendants argue that Klein's survey is "nothing more than a meaningless memory game or word association exercise that bears no relationship to the marketplace." *Id.* at 7. Plaintiff, on the other hand, argues that Klein's survey does in fact mirror how the marks are encountered in the marketplace. Specifically, Plaintiff asserts that Klein's survey replicates how the marks appear when viewed through the parties' respective websites. Doc. 122, Pl.'s Resp., 11–13. And because Plaintiff mostly cites to instances of actual confusion that occur over the internet, Plaintiff argues Klein's survey "is the best replication of the marketplace . . . to either corroborate or discount the instances of actual confusion." *Id.* at 12–13.

The Court agrees with Plaintiff. A survey is necessarily an "imperfect mirror of actual customer behavior under real-life conditions." 6 *McCarthy on Trademarks* § 32:178. And the imperfections of Klein's survey that Defendants have identified simply do not rise to the level of flaws so serious as to warrant exclusion.

C.  *Consumers' Awareness of FRG*

Defendants contend that Klein improperly assumed a market awareness that does not exist.

Specifically, "Mr. Klein's survey did not test consumers' awareness of FRG, and there is no evidence that restaurant patrons are aware of FRG." Doc. 129, Defs.' Reply, 5. But, as stated above, the law requires that "the appropriate universe should include a fair sampling of those purchasers *most likely* to partake of the alleged infringer's goods or services." *Scott Fetzer Co.*, 381 F.3d at 487–88 (emphasis added). And Klein's survey was designed to capture the responses of "potential customers of restaurants operated by FRG." Doc. 122, Pl.'s Resp., 8. Klein's purported reliance on actual consumer knowledge is a criticism that can be adequately explored at trial. It is not "fatal" to the admissibility of his testimony.

D.  *Suggesting Affiliation*

Defendants next contend that the Klein survey ought to be excluded for improperly suggesting an affiliation between Firebird and FRG. Doc. 129, Defs.' Reply, 2. Specifically:

> Mr. Klein's survey also employed biased questioning by asking whether FWFG [Firebirds Wood-Fired Grill] was "part of" FRG and, if consumers answered negatively, whether FWFG "has a business connection or affiliation with" FRG. . . . This improperly suggests a connection between the two entities because it pressures participants, who have already responded that FWFG was not part of FRG, to look for some other type of business connection or affiliation between the entities.

*Id.* at 8.

The Court finds it difficult to justify exclusion of the survey on this basis. Any survey question runs the risk of "pressuring" the respondent to search for a connection he or she otherwise may not have drawn. And the cases Defendants cite are not similar this one. For example, in *Scott Fetzer*, the Fifth Circuit held that two questioning flaws were fatal to a survey's evidentiary value. The court first held that use of the phrase "*in any way*" in the question "'is [Defendant] *in any way* affiliated with, connected with, sponsored by, associated with or authorized by [Plaintiff]' . . . prodded survey

participants to search for any connection, no matter how attenuated, between the two companies." *Scott Fetzer Co.*, 381 F.3d at 488 (emphasis added). Second, the court held that this question improperly "suggested a connection between the parties instead of permitting participants to make their own associations." *Id.* Klein did not include the phrase "in any way" in his questions, and he asked whether Plaintiff's restaurant "is part of" or "is not part of" Defendants. Doc. 93-2, Defs.' App., 118–19. Klein rotated whether "is part of" or "is not part of" came first in the question. *Id.* Additionally, respondents were given the opportunity to explain in their own words what made them believe the restaurant was part of the restaurant group or why they were unsure of the answer. *Id.* While these questions may, to some degree, be leading and thus affect the evidentiary weight of the survey, they are not so badly flawed as to affect its admissibility.

E.  *Proper Control*

Finally, Defendants assert that "Mr. Klein failed to use a proper control, thereby turning his survey into nothing more than a task for respondents to match the two companies with 'Fire' in their name." Doc. 129, Defs.' Reply, 8. The control in Klein's survey was identical to FRG's logo, including the flame, except that "Firebird" was changed to "Tanager." According to Defendants, "where Mr. Klein is testing 'Firebird,' and FRG's logo includes a flame, Mr. Klein should have selected a control that included the word 'Fire.'" *Id.* Plaintiff argues that synonyms of the trademark at issue are routinely used as controls in likelihood-of-confusion surveys. According to Plaintiff, then, Klein's swap of "Tanager" for "Firebird" on the control-stimulus webpage was ordinary and proper.

Klein's control retained all aspects of the FRG mark, including the flame, the colors, the font, and the identification of the brand restaurants, except for the word "Firebird." Doc. 122, Pl.'s Resp., 16. This is how an appropriate control should be designed. *See 6 McCarthy on Trademarks* § 32:187

("[A]n appropriate control . . . should share as many characteristics with the experimental stimulus as possible with the key exception of the characteristic whose influence is being assessed."). Granted, had control-group respondents been asked whether they believed "Firehouse" (or some other word containing "Fire") was "part of" or "affiliated with" FRG, one may be in a better position to know to what extent respondents truly were simply "matching" Plaintiff's mark to Defendants'. But Klein's inclusion of a "Why?" question—by which participants explained their reasons for choosing an affirmative answer—helps resolve this uncertainty. Thus, the control Klein selected does not render his survey inadmissible.

## IV.

## CONCLUSION

For the reasons set forth above, the Court cannot find that the Klein survey is "so badly flawed that it cannot be used to demonstrate the existence of a question of fact on the likelihood of consumer confusion." *See Scott Fetzer Co.*, 381 F.3d at 487. Rather, the methodological shortcomings of Klein's survey bear on its evidentiary weight, not its admissibility. *See id.* at 488. Therefore Defendants' Motion to Strike the Report and Opinions of Robert Klein (Doc. 91) is **DENIED**.

**SO ORDERED.**

**SIGNED: August 21, 2019.**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE